Filed 8/4/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, Petitioner, v. PUBLIC UTILITIES COMMISSION, Respondent. SOUTHERN CALIFORNIA EDISON COMPANY et al., Real Parties in Interest. | G065804 (Cal. P.U.C. Dec. Nos. D.24-11-004, D.25-06-067) O P I N I O N |

ORIGINAL PROCEEDINGS; petition for a writ of review of decisions by the California Public Utilities Commission. Decisions affirmed. Request for Judicial Notice. Granted.

Knobbe, Martens, Olson & Bear, Mark D. Kachner, Ben Shiroma and Stephen C. Jensen for Petitioner.

Christine Hammond, Sophia J. Park, C. Willie Duhart and Shanna Foley for Respondent.

Munger, Tolles & Olson, Henry Weissmann and Jeffrey Y. Wu for Real Parties in Interest Southern California Edison Company, Pacific Gas & Electric Company and San Diego Gas & Electric Company.

Adams Broadwell Joseph & Cardozo, Rachael E. Koss and Darion N. Johnston for Real Party in Interest Coalition of California Utility Employees.

\* \* \*

## INTRODUCTION

This writ of review[1] proceeding arises out of a rulemaking[2] instituted by the California Public Utilities Commission (the PUC) to begin the creation of a policy framework for facilitating the commercialization of microgrids under Senate Bill No. 1339 (Stats. 2018, ch. 566), Public Utilities Code section 8370 et seq. The rulemaking proceeded in five tracks. In track five, the PUC issued decision No. D.24-11-004 adopting the multi-property microgrid tariffs[3] submitted by Southern California Edison (SCE), Pacific

---

[1] "A petition for a 'writ of review' is the procedural device for obtaining judicial review of final decisions of the Agricultural Labor Relations Board, Alcoholic Beverage Control Appeals Board, Public Utilities Commission, and Workers' Compensation Appeals Board." (*Superior Court v. Public Employment Relations Bd.* (2018) 30 Cal.App.5th 158, 169, fn. 4; see generally Pub. Util. Code, § 1756, subd. (a).)

[2] A rulemaking is a quasi-legislative proceeding which establishes rules affecting an entire industry. (Pub. Util. Code, § 1701.1, subds. (a), (d)(1).)

[3] Tariffs set forth the terms and conditions of service to a utility's customers and may refer to a utility's individual rates, tolls, rentals, charges, classifications, special conditions, and rules. (Cal. Pub. Util. Com. General Order 96-B, General Rule 3.15; see Pub. Util. Code, § 489, subd. (a); *Bullseye Telecom, Inc. v. Public Utilities Com.* (2021) 66 Cal.App.5th 301, 317, fn. 17; Cal. Pub. Util. Com., Tariff Filing Requirements

Gas & Electric (PG&E), and San Diego Gas & Electric (SDG&E). In that decision, the PUC also declined to adopt a proposed tariff by Applied Medical Resources Corporation (AMR), which had sought to amend three of SCE's existing tariff rules. The PUC later denied AMR's application for rehearing in PUC decision No. D.25-06-067.

AMR brought a petition for writ of review to challenge PUC decision Nos. D.24-11-004 and D.25-06.067. We directed the issuance of a writ in order to review those decisions.

AMR contends the PUC decisions must be reversed because the PUC made statements unsupported by the record and failed to proceed in the manner required by law. We conclude otherwise. The PUC's decisions are consistent with controlling law, most notably Public Utilities Code sections 218 and 8371,[4] and are not arbitrary, capricious, or lacking in evidentiary support. Accordingly, we affirm the PUC's decisions.

### THE PARTIES

The petitioner is AMR, a California corporation with its principal place of business in Rancho Santa Margarita. AMR makes "high quality medical devices in cutting edge manufacturing facilities in Southern California."

The respondent is the PUC, a state agency created by article XII of the California Constitution. (Cal. Const., art. XII, §§ 1, 2.)

---

<https://www.cpuc.ca.gov/industries-and-topics/internet-and-phone/carrier-reporting-requirements/tariff-filing-requirements#:~:text=General%20Order%2096%2DB%20%C2%A7%203.15,publish%20as%20directed%20by%20the> [as of Aug. 4, 2026], archived at: <https://perma.cc/7WT5-3VEL>.)

[4] Further code references are to the Public Utilities Code unless otherwise indicated.

Real parties in interest SCE, PG&E, and SDG&E are public utilities under section 216, subdivision (a)(1) and subject to PUC regulation under section 701. (See Cal. Const., art. XII, § 3.) SCE, PG&E, and SDG&E refer to themselves collectively as the Investor-Owned Utilities or IOU's. We shall do the same.

Real party in interest Coalition of California Utility Employees (CUE) is a coalition of labor unions that represent workers employed by the IOU's.

## BACKGROUND LAW

*The PUC's Authority*

"'The Constitution confers broad authority on the [PUC] to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures.'" (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 914–915, citing Cal. Const., art. XII, §§ 2, 4, 6.)

In addition to the PUC's constitutional powers, the Legislature has authorized the PUC to "supervise and regulate every public utility" in California and to "*do all things*, whether specifically designated in [the Public Utilities Act] or *in addition thereto*, which are necessary and convenient" in the exercise of its jurisdiction over public utilities. (§ 701, italics added.) The PUC's authority is therefore to be liberally construed. (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792.)

*Sections 216 and 218*

Sections 216 and 218 are of particular importance to this matter. Section 216, subdivision (a) defines the term "'Public utility'" to include "every . . . electrical corporation . . . where the service is performed for, or the commodity is delivered to, the public or any portion thereof."

4

Section 218, subdivision (a) (section 218(a)) defines "'Electrical corporation'" to include "every corporation or person owning, controlling, operating, or managing any electric plant for compensation within this state, except where electricity is generated on or distributed by the producer through private property solely for its own use or the use of its tenants and not for sale or transmission to others." SCE, PG&E, and SDG&E are electrical corporations under section 218(a).

Section 218, subdivision (b) (section 218(b)) as relevant here, also defines an electrical corporation as *not* including a corporation which produces power from other than a conventional power source for generating electricity for at least one of the following purposes: 1. "[The corporation's] own use or the use of its tenants"; 2. "The use of or sale to not more than two other corporations or persons solely for use on the real property on which the electricity is generated or on real property immediately adjacent thereto." (§ 218, subd. (b)(1), (2).) As to the second purpose, if there is an intervening public street constituting the boundary between the real property on which the electricity is generated and the immediately adjacent property, then the corporation is not deemed to be an electrical corporation if "[t]he real property on which the electricity is generated and the immediately adjacent real property is not under common ownership or control, or that common ownership or control was gained solely for purposes of sale of the electricity so generated and not for other business purposes."[5] (*Id.*, subd. (b)(2)(A).)

---

[5] There are two other factors determinative of whether the corporation would be an electrical corporation in the case of an intervening public street, but they are not relevant here.

5

Recognizing the potential benefits of microgrids, the Legislature in 2018 enacted Senate Bill No. 1339 (Stats. 2018, ch. 566, § 2), which added sections 8370, 8371, and 8372 to the Public Utilities Code. (See Historical and Statutory Notes, 57C West's Ann. Pub. Util. Code (2026 supp.) foll. § 8370, p. 31.) Section 8371 directed the PUC, in consultation with the Energy Commission and the Independent System Operator, to undertake certain specified actions by December 1, 2020 "to facilitate the commercialization of microgrids for distribution customers of large electrical corporations." (§ 8371, subd. (a).) Those actions included "develop[ing] methods to reduce barriers for microgrid deployment" and "develop[ing] separate large electrical corporation rates and tariffs, as necessary, to support microgrids, while ensuring that system, public, and worker safety are given the highest priority." (*Id.*, subds. (b), (d).)

A microgrid is statutorily defined as "an interconnected system of loads and energy resources, including, but not limited to, distributed energy resources, energy storage, demand response tools, or other management, forecasting, and analytical tools, appropriately sized to meet customer needs, within a clearly defined electrical boundary that can act as a single, controllable entity, and can connect to, disconnect from, or run in parallel with, larger portions of the electrical grid, or can be managed and isolated to withstand larger disturbances and maintain electrical supply to connected critical infrastructure." (§ 8370, subd. (d).)[6]

---

[6] A simpler definition of microgrid is found in the June 27, 2018 Assembly Committee on Utilities and Energy Analysis of Senate Bill No. 1339: "Generally, a microgrid is understood to be a self-contained, small, electricity system with the ability to manage critical customer resources, disconnect from the electric grid when the need arises, and provide the

The term "'[d]istributed energy resource'" is defined to mean "an electric generation or storage technology" that complies with State Air Resources Board emissions standards. (§ 8370, subd. (b).)

**BACKGROUND FACTS**

This proceeding arises out of a dispute between AMR and SCE over electrically connecting a microgrid between two AMR-owned properties that are separated by a public street. In its petition for review, AMR alleged it "generates electricity solely for its own consumption on its properties using private resources and does not export or sell electricity to others. . . . AMR employs these microgrids at several of its properties that are interconnected to [SCE]'s distribution grid."[7]

According to AMR, since June 2015 "AMR has been attempting to build a microgrid, by utilizing private facilities, i.e., its own resources and equipment, not utility-owned facilities, to electrically connect two AMR-owned properties across a public street." AMR's goal was to electrically connect its two properties using an "AMR-owned distribution line" or "private distribution facilities."

AMR also intended its microgrid to be interconnected to SCE's distribution grid using facilities installed and owned by SCE. AMR thus

---

customer with different levels of critical support." (Assem. Com. on Utilities and Energy, Analysis of Sen. Bill No. 1339 (2017–2018 Reg. Sess.) as amended June 11, 2018, p. 2.)

[7] AMR refers to its connection to SCE's distribution grid as an "interconnection." According to AMR, its proposed electrical connection between its two properties is not an interconnection because the connection would not go through SCE's distribution grid. SCE also uses the term interconnection to refer to "the interconnection of a generating facility to SCE's electrical grid." We shall follow the same distinction between interconnection and connection.

7

alleged, "[a]though AMR endeavors to generate enough power to be self-sustaining for most days, at times its load exceeds its generation capabilities, and an additional power source is needed. At these times, AMR relies on interconnection to [SCE]'s distribution grid for supplemental power." (Fn. omitted.)

In filings with the PUC, AMR claimed that "[d]espite AMR obtaining the necessary local approvals and acknowledging there were no Section 218 issues applicable to AMR's microgrid proposal, SCE declined to take further action to support AMR's microgrid deployment arguing that it had unfettered discretion to decline to add any facilities to its system or make any adjustments to its facilities to effectuate AMR's microgrid—even if AMR agreed to pay for all such facilities." AMR also argued to the PUC that "SCE apparently believes it can refuse to interconnect AMR's Section 218 compliant microgrid and refuse to identify any specific basis for the refusal." AMR alleged in its petition for writ of review that since 2018 "SCE has denied without legal basis AMR's requests to . . . electrically connect AMR's two properties using AMR's privately owned equipment." Such electrical connection, AMR claimed, was necessary for it to most efficiently utilize its microgrid.

The PUC disputes AMR's claim that it denied AMR's request without legal bases and believed it had unfettered discretion to do so. In comments filed as part of the PUC rulemaking, SCE stated it had denied AMR's request for these reasons: "AMR['s] . . . project, which sought to distribute electricity to eight of its 14 buildings, would require electric connections that travel under public streets pursuant to SCE's franchise agreement. To enable this, AMR's proposal would result in SCE's existing facilities beyond the meter, including underground cables, transformers, and

8

related equipment being sold to AMR, removed, or abandoned in place. As SCE currently uses those facilities to serve other customers, as well as AMR, it would impair SCE's abilities to service those customers or require construction of new facilities to serve them and could make those SCE customers more vulnerable to an outage or other electrical event. Under state law and [ ]PUC regulation, the utility is the entity responsible for the safe operation of the grid, and it is therefore appropriate for the utility to have discretion to decline to accept an added facilities proposal or decline to accept a proposal that requires the abandonment, sale, and/or replacement of existing assets."

## PROCEDURAL HISTORY

### I.

### PUC's Rulemaking Proceeding to Facilitate Commercialization of Microgrids, Tracks 1-4

In September 2019, the PUC issued an order instituting Rulemaking 19-09-009 to begin creating "a policy framework surrounding the commercialization of microgrids" with a "focus on implementation of Senate Bill (SB) 1339." The scope of the rulemaking extended to "all microgrid policy framework issues," including "programs, rules, and rates related to microgrids that will help accomplish the state's broader policy goals."

The PUC divided the rulemaking into five tracks. Track 1 addressed "the [PUC]'s goal of deploying resiliency planning in areas that are prone to outage events and wildfires, with the goal of establishing key microgrid and resiliency strategies as soon as possible." The PUC issued its track 1 decision (No. D.20-06-017) in June 2020.

In track 2, the PUC was required "to implement microgrid standards, protocols, guidelines, methods, rates, and tariffs as well as reduce

barriers to microgrid deployment statewide." The PUC issued its track 2 decision (No. D.21-01-018) in January 2021. In that decision, the PUC adopted "microgrid rates, tariffs, and rules for large investor owned electrical corporations." The PUC directed (1) SCE "to revise its Rule 2 to permit installing added or special facilities microgrids"; (2) SCE and PG&E "to revise their Rule(s) 18, and [SDG&E] to revise its Rule 19, to allow microgrids to serve critical customers on adjacent parcels"; (3) SCE, PG&E, and SDG&E to "each form a new microgrid tariff for their respective service territories"; (4) SCE, PG&E, and SDG&E to "jointly develop a Microgrid Incentive Program"; and (5) SCE, PG&E, and SDG&E "to develop pathways for the evaluation and approval of low-cost, reliable electrical isolation methods."

Following the decision on track 2, the PUC proceeded to track 3. In its decision on track 3 (No. D.21-07-011), issued in July 2021, the PUC directed PG&E, SCE, and SDG&E "to provide rate schedule(s) that suspend the capacity reservation component of their standby charge for eligible microgrids that meet the California Air Resources Board air pollution standards for generation."

Track 4 proceeded in two phases. In its decision on the first phase of track 4 (No. D.21-12-004), issued in December 2021, the PUC adopted "enhanced summer 2022 and summer 2023 requirements" for PG&E and SDG&E. In its decision on the second phase of track 4 (No. D.23-04-034), issued in April 2023, the PUC adopted implementation rules for the Microgrid Incentive Program, which was intended to encourage renewable microgrid development. The PUC announced that "issues pertaining to the microgrid multi-property tariff" would be resolved in track 5.

10

## II.

### Track 5: Development of a Microgrid Multi-Property Tariff

A. *Scope of Track 5*

The purpose of track 5 was to develop a tariff for multi-property microgrids. In the scoping memorandum for track 5,[8] issued in July 2023, the PUC identified the issues for determination, which included, "[w]hat guiding principles should the [PUC] adopt to assist in the development of a microgrid multi-property tariff?" and "[w]hether PG&E should modify its Community Microgrid Enablement Tariff."

In August 2023, the assigned administrative law judge (ALJ) issued a ruling directing the IOU's to prepare and submit a draft pro-forma standard multi-property microgrid tariff based upon PG&E's Community Microgrid Enablement Tariff. The ALJ directed the IOU's to follow certain requirements when forming those tariffs, including to "[c]omply with Section 218," to "[a]ddress and prioritize safety and system reliability, including but not limited to, public and worker safety, utility system protection, and cybersecurity," and to "[a]llow for the utility to always maintain control of its distribution system."

In October 2023, the ALJ modified the scoping memorandum to allow stakeholders, which included AMR, to submit draft proposed microgrid multi-property tariffs of their own. The ALJ directed the stakeholders to follow the same requirements imposed on the IOU's for forming those tariffs.

---

[8] A scoping memorandum "sets forth the issues, need for hearing, schedule, category, and other matters necessary to scope this proceeding."

B. *SCE's Proposed Tariff and AMR's Proposed Tariff for Track 5*

In October 2023, SCE, on behalf of the IOU's, submitted a proposed tariff based on a revised version of the Community Microgrid Enablement Tariff. AMR and other stakeholders submitted comments on the IOU's proposed tariff, tariff proposals of their own, and reply comments.

Motivated by its experience with SCE, AMR submitted a proposed tariff in order "to remove barriers to the commercialization of multi-property microgrids pursuant to Public Utilities Code Sec. 8371." According to AMR, SCE had claimed it had "unfettered discretion" under SCE Rules 2 and 16 of its tariff books[9] "to decline to take any action to help AMR develop its microgrid." To eliminate any such discretion, AMR proposed three "focused modifications" to SCE Rules 2, 16, and 18. SCE Rule 2 is entitled "Description of Service," SCE Rule 16 is entitled "Service Extensions," and SCE Rule 18 is entitled "Supply to Separate Premises and Use by Others." (Capitalization omitted.)

The following are portions of SCE Rules 2, 16, and 18, with AMR's proposed rule changes bracketed and in italics.

SCE Rule 2.H.1: "Added Facilities. [¶] 1.  Where an applicant requests and SCE agrees to install facilities which are in addition to, or in

_____

[9] The IOU's request we take judicial notice of SCE rules 2, 16, and 18 of its tariff books pursuant to Evidence Code section 451, subdivision (a). We grant this unopposed request. "A public utility's tariffs filed with the PUC have the force and effect of law." (*Dollar-A-Day Rent-A-Car Systems, Inc. v. Pacific Tel. & Tel. Co.* (1972) 26 Cal.App.3d 454, 457, citing *Dyke Water Co. v. Public Utilities Com.* (1961) 56 Cal.2d 105, 123 [Once a tariff is published and filed with the PUC, it has "the force and effect of a statute"].) SCE Rules 2, 16, and 18 are directly relevant to this writ of review proceeding. We are therefore required by Evidence Code section 451, subdivision (a) to take judicial notice of the SCE tariff rules 2, 16, and 18. We refer to an SCE tariff rule as "SCE Rule" followed by the number.

12

substitution for the standard facilities SCE would normally install, the costs thereof shall be borne by the applicant. [*Where the customer seeks to develop a microgrid that is compliant with Section 218, SCE shall agree to install facilities which are in addition to, or in substitution for the standard facilities SCE would normally install, and that meet nationally recognized safety and reliability standards, the costs thereof shall be borne by the applicant.*] Unless otherwise provided by SCE's filed tariff schedules, these added facilities (special facilities) will be installed, owned and maintained or allocated by SCE solely as an accommodation to the applicant."[10]

SCE Rule 16.F.2.b: "Applicant Convenience. Any relocation or rearrangement of SCE's existing Service Facilities at the request of Applicant (aesthetics, building additions, remodeling, etc.) and agreed upon by SCE shall be performed in accordance with Section D above except that Applicant shall pay SCE its total estimated costs. [*Where the customer seeks to develop a microgrid that is compliant with Section 218, SCE shall agree to relocate or rearrange SCE's existing facilities in a manner that meets nationally recognized safety and reliability standards, the costs thereof shall be borne by the applicant.*]"

SCE Rule 18.C: "Other Uses or Premises. A customer shall not use electricity received from SCE upon other Premises for other purposes than those specified in the customer's application or in the rate schedule applied except: [¶] 1. For SCE's Operating Convenience as defined in SCE's Rule 1, or [¶] . . . [¶] 2. Where, pursuant to Decision 21-01-018, behind-the-

---

[10] The term "Added Facilities" is defined in SCE Rule 2.H.1 to include "all types of equipment normally installed by SCE in the development of its electrical transmission and distribution systems and facilities or equipment related to SCE's provision of service to a customer . . . ."

meter microgrids owned by public agencies or a third-party that primarily serves a facility operated by, or on behalf of, a public agency are permitted to supply electricity to a critical facility. . . . (Fns. omitted.) [[*3.*] *Where a customer operates a microgrid that serves the customer's other Premises but that otherwise complies with Public Utilities Code Section 218*]."

C. *Comments to AMR's Proposed Rule Changes*

In comments to AMR's proposed rule changes, SCE stated: "[AMR's] project, which sought to distribute electricity to eight of its 14 buildings, would require electric connections that travel under public streets pursuant to SCE's franchise agreement. To enable this, AMR's proposal would result in SCE's existing facilities beyond the meter, including underground cables, transformers, and related equipment being sold to AMR, removed, or abandoned in place. As SCE currently uses those facilities to serve other customers, as well as AMR, it would impair SCE's abilities to service those customers or require construction of new facilities to serve them and could make those SCE customers more vulnerable to an outage or other electrical event."

SCE also asserted it is responsible for safe grid operation and "it is therefore appropriate for the utility to have discretion to decline to accept an added facilities proposal or decline to accept a proposal that requires the abandonment, sale, and/or replacement of existing assets." SCE added that AMR could bring its particular case to the PUC for determination, as any complainant could do in a tariff dispute.

The CUE also submitted comments to AMR's tariff proposals. The CUE asserted that any proposal that allowed a nonutility to control the power grid was "totally and unequivocally unacceptable" because "[t]o ensure that 'system, public, and worker safety are given the ***highest priority***,'

14

regulated utilities absolutely must operate and control their distribution grid, including microgrids serving multiple properties that connect to or disconnect from larger portions of the grid." (Fn. omitted.)

In response to SCE's comments, AMR asserted the PUC "has a defined process to administer necessary facility transfers and valuations allowing the [PUC] to discharge the requirements of Public Utilities Code Sec. 851." Therefore, AMR claimed, "[r]emoving or transferring redundant or unnecessary facilities as part of an interconnection should not operate as a barrier to AMR's planned microgrid." AMR described as "vague and uncertain" SCE's fears that its microgrid project "would require deployment of new facilities to avoid impairment to SCE's continued service to its other customers." As to CUE's comments, AMR asserted there was "no factual basis" for the assumption that private distribution facilities are unsafe and that local authorities would ensure that AMR's microgrid meets applicable safety standards.

### III.

### The PUC's Decision on Track 5

The PUC issued its decision for track 5, No. D.24-11-004, in November 2024. In its decision, the PUC adopted, with some modifications, the multi-property microgrid tariffs submitted by the IOU's. The PUC declined to adopt various stakeholder recommendations that would have "effectively exempt[ed] private microgrids that own, control, operate, or manage distribution grid assets or other electrical infrastructure from [PUC] jurisdiction."

The PUC made 92 findings of fact, including the following, generally applicable, findings: "13. To ensure system, public, and worker safety are given the highest priority, a regulated utility must control and

15

operate a multi-property microgrid if the multi-property microgrid uses the regulated utility's distribution system. [¶] . . . [¶] 15. Worker safety and grid reliability are absent from the stakeholder proposals. [¶] 16. Regulated control of the distribution system is essential to public and worker safety and grid reliability. [¶] 17. After any outage, crews must perform restoration work to ensure that it is safe to reenergize the electric utility's grid. [¶] 18. An unregulated third party cannot decide when a microgrid may begin actively discharging to the electric utility's grid while utility employees may be working on the grid. [¶] 19. To ensure system, public, and worker safety are given the highest priority, regulated entities must operate and control their electric distribution grid."

The PUC declined to adopt AMR's proposed rule changes. The PUC found that "AMR's proposed tariff focuses on a narrow set of priorities and does not fit within the contours of Section 218" and "circumvents Section 218." The PUC concluded: "1. The multi-property microgrid tariff proposals of AMR. . . should be rejected because each of the proposals fail[s] to comply with numerous statutory requirements of the California Public Utilities Code and the [PUC]'s regulatory authority established in the California Constitution. [¶] 2. AMR's proposal should not be adopted because it does [not] comply with Section 218."

## IV.

## AMR's Application for Rehearing

AMR applied for rehearing of the PUC's decision. As relevant here, AMR's grounds for rehearing were: (1) AMR's proposals were limited to microgrids that were compliant with section 218 and therefore the PUC erred by finding those proposals were an attempt to circumvent section 218 and (2) the PUC's decision violated section 8371.

16

The PUC denied AMR's application for rehearing in its decision No. D.25-06-067. As to AMR's first ground for rehearing, the PUC found: "AMR's proposal involves delivering electricity between two AMR-owned properties separated by a public street, using SCE-owned infrastructure. . . . AMR's proposed changes to [SCE] [R]ules 2, 16, and 18 were to enable AMR to carry out its specific, localized project, and interconnect its properties across public streets without investor-owned utility (IOU) interference. [¶] The Decision found that AMR's proposal, which would allow an unregulated private party to control utility infrastructure and operate a multi-property microgrid independently, violates section 218. . . . The [PUC] also held that exclusive operational control over a microgrid, particularly the ability to enter islanding mode without prior authorization from the incumbent IOU, constitutes utility service requiring Commission oversight. . . . [¶] Indeed, AMR's proposed configuration raises both legal and regulatory issues. The microgrid's layout and ownership structure would effectively allow AMR to function as a de facto utility without being subject to the statutory and regulatory obligations imposed on electrical corporations. . . . In this context, the crossing of public streets is significant because it implicates utility franchise rights and easements and extends the microgrid beyond the boundaries typically associated with private electric systems."

The PUC also found: "AMR's proposal assigns full operational and maintenance responsibilities for the microgrid to AMR, bypassing standard utility safety protocols and oversight. . . . This raises concerns under section 451, which requires that all public utility practices and infrastructure maintain standards of safety, reliability, and service quality in the public interest. If the IOU were no longer able to exercise discretion over whether

17

and how a microgrid interconnection operates, it could affect the IOU's ability to ensure compliance with those standards."

As to AMR's second ground for rehearing, the PUC found it had satisfied the statutory requirements of section 8371 and that "AMR fails to point to any provision of section 8371 that mandates the adoption of its proposal." (Boldface omitted.)

## V.

## AMR's Petition for Writ of Review

AMR filed its petition for writ of review to obtain judicial review of PUC decision Nos. D.24-11-004 and D.25-06-067. AMR's petition sought review of two issues: 1. "Whether the California Public Utilities Commission failed to proceed in the manner required by law when it interpreted Section 218 in a manner that conflicts with the plain language of the statute?" and 2. "Whether the California Public Utilities Commission failed to proceed in the manner required by law when it found that 'The Commission has already satisfied the requirements of section 8371' with 'Decisions 20-06-017 and 21-01-018, which satisfied all requirements of the statute, prior to the December 1, 2020 deadline'?"

After receiving answers from the PUC, the IOU's, and CUE, and a reply from AMR, we directed the issuance of a writ. The record was certified by the PUC pursuant to section 1756, subdivision (a), and the parties filed supplemental briefs.

## STANDARD OF REVIEW

Sections 1757 and 1757.1 specify the bases upon which a reviewing court may set aside a decision of the PUC. (*Center for Biological Diversity, Inc. v. Public Utilities Com.* (2025) 18 Cal.5th 293, 303 (*Center for Biological Diversity*).) "Section 1757 applies to complaint and enforcement

18

proceedings and ratemaking and licensing decisions that are 'addressed to [specific] parties,' while section 1757.1 applies in any proceedings not covered by section 1757." (*Ibid*.) Here, the PUC decisions being challenged are rulemaking decisions, not a complaint and enforcement proceeding or ratemaking and licensing decision, and therefore are subject to section 1757.1. The parties agree.

Section 1757.1, subdivision (a) limits review of a PUC rulemaking decision to the determination whether: "(1) The order or decision of the commission was an abuse of discretion. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (4) The decision of the commission is not supported by the findings. [¶] (5) The order or decision was procured by fraud. [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." Section 1757.1 does not authorize a substantial evidence review of the PUC's findings. (*California Community Choice Assn. v. Public Utilities Com.* (2024) 103 Cal.App.5th 845, 853–854 (*Community Choice*).)

An appellate court independently determines whether the agency prejudicially abused its discretion by failing to proceed in the manner required by law, such as by failing to comply with required procedures, applying an incorrect legal standard, or committing some other error of law. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479; *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 355.)

Because the PUC decisions being challenged are rulemakings, they are deemed to be quasi-legislative. (§ 1701.1, subd. (d)(1).) "Quasi-

19

legislative regulations . . . are subject to a substantially narrower scope of review: 'If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end.'" (*Center for Biological Diversity, supra*, 18 Cal.5th at p. 305.) Quasi-judicial rules are nonetheless reviewed "'independently for consistency with controlling law,'" and the reviewing court independently reviews "whether an agency has lawmaking authority, even if it may be appropriate to defer to an agency's reasonable exercise of any such authority." (*Id*. at pp. 305–306.)

The party challenging a PUC quasi-legislative decision on the ground the decision constituted an abuse of discretion bears the burden of showing the decision was "'arbitrary, capricious, or entirely lacking in evidentiary support.'" (*Community Choice, supra*, 103 Cal.App.5th at p. 856.) The question whether agency action is entirely lacking in evidentiary support is not the same as a substantial evidence test. (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461.)

## DISCUSSION

### I.

### Overview

AMR does not challenge any aspect of the microgrid multi-property tariff approved by the PUC. AMR challenges only the PUC's decisions rejecting its proposed changes to SCE Rules 2, 16, and 18. AMR contends the PUC erred on the grounds that (1) The PUC's rehearing decision was based on statements that were not supported by any findings of fact and were inconsistent with the record (§ 1757.1, subd. (a)(4)) and (2) the PUC did not proceed in the manner required by law (*id*., subd. (a)(2)).

20

We address the first ground in subsection II below. We conclude that the challenged PUC statements are not entirely wrong and, if they are, the mistakes were unnecessary to the PUC's decisions and therefore harmless.

As to the second ground, AMR argues the PUC did not proceed in the manner required by law by misinterpreting and misapplying sections 218 and 8371. In subsection III below, we address AMR's arguments regarding section 218. We conclude the PUC did not err by concluding AMR's proposed rule changes did not comply with section 218 because those changes could lead to an unregulated entity being able to control and compel modifications to a regulated utility company's distribution system. In subsection IV, we address statutes other than section 218 which support the PUC's decision. We conclude sections 399.2 and 451, as well as the priority given to safety considerations expressed in section 8371, also support the PUC's decisions.

In subsection V below, we address AMR's arguments regarding section 8371. We conclude the PUC correctly found it had satisfied the requirements of section 8371, the PUC's decisions are consistent with both section 8371's direction to facilitate commercialization of microgrids and section 8371's legislative history, and AMR forfeited its claim regarding neighborhood-type microgrids.

## II.

### If the PUC Misstated the Facts, the Error Was Immaterial

In the rehearing decision, the PUC stated that "AMR's proposal involves delivering electricity between two AMR-owned properties separated by a public street, using SCE-owned infrastructure" and that "[t]he Decision found that AMR's proposal, which would allow an unregulated private party

to control utility infrastructure and operate a multi-property microgrid independently, violates section 218." AMR contends those statements were unsupported by the PUC's factual findings and are incorrect because under the proposed rule changes, "AMR would not use or control SCE's utility infrastructure."

To assess AMR's contentions, some background information is necessary. We have explained at footnote 7 on page 7, the difference between connection and an interconnection. In this writ proceeding, AMR places great emphasis on its claim that it intended only to connect its two properties using privately owned equipment. AMR asserts its goal was to electrically connect its two properties that are divided by a public street by using an "AMR-owned distribution line" or "private distribution facilities." In its petition for writ of review, AMR alleged it made its proposed rule changes "because SCE previously denied AMR's request to allow AMR's planned electrical *connection* despite SCE admitting it had no legal basis to do so." (Italics added.)

But in its tariff proposal, AMR asserted that its proposed changes to SCE Rules 2 and 16 were necessary to allow AMR to *interconnect* its microgrid to SCE's distribution system. AMR stated in its tariff proposal that "where Added Facilities are required to allow the IOU to *interconnect* the microgrid safely and reliably, [SCE] Rule 2 can be triggered" and "in situations where an IOU must reconfigure its system to support the safe deployment of a customer microgrid [SCE] Rule 16 can be triggered." (Italics added.) AMR also asserted that SCE abused its discretion when it "decline[d] AMR's request to *interconnect* its section 218 microgrid." (Italics added.) AMR argued that "[SCE] Rules 2 and 16 should be modified to explicitly state that IOU[']s do not have unfettered discretion to decline to either add facilities to

22

their system or modify their system to support deployment of customer microgrids."

In the application for rehearing, AMR asserted it had been attempting to develop a microgrid by electrically connecting two AMR-owned properties, "[b]ut AMR lacks a clear regulatory pathway to construct and *interconnect* this privately owned electrical system, because SCE mistakenly believes it has unfettered discretion to deny the *interconnection* request" and "SCE apparently believes it can refuse to *interconnect* AMR's Section 218 compliant microgrid." (Italics added.)

It is not entirely clear whether AMR's grievance against SCE arises from its denial of an interconnection request or of a request to accommodate a connection between AMR's two properties independently of SCE's distribution system. But regardless of whether AMR's proposed rule changes would affect connections or interconnections, or both, the statements in the PUC's rehearing decision are not entirely wrong. As we explain below in subsection III, AMR's proposed rule changes would have created the potential for microgrid operators to exert some degree of control over a regulated utility's infrastructure. And in the case of an interconnection, SCE would own its own distribution system (including easement rights) and, under SCE Rule 2.H.1, would own additional or substitute facilities installed to accommodate AMR's interconnection request. In that way, the PUC's statement that AMR intended to use SCE-owned infrastructure is at least partly correct.

In opposing AMR's proposed rule changes, SCE claimed that "AMR's proposal would result in SCE's existing facilities being *sold* to AMR, removed, or abandoned in place." (Italics added.) AMR's response, that there was or should be a process for "necessary facility transfers," supports the

23

PUC's finding that AMR's proposed rule changes would in fact lead to AMR's acquisition of SCE infrastructure.

But even if the PUC misstated the record in the way AMR describes, the mistake is immaterial because the supposedly misstated facts were unnecessary to the PUC's decisions. In track 5 the PUC was neither determining whether AMR's project should go forward nor adjudicating the dispute between AMR and SCE. The issue before the PUC was whether to adopt AMR's proposed rule changes, and those changes were not limited in application to AMR's project or its dispute with SCE. Those proposed rule changes were of universal application and do not stand or fall on the specific facts relating to AMR and its microgrid project.

### III.
### The PUC's Decisions Were Not Based on a Misinterpretation or Misapplication of Section 218

AMR contends the PUC failed to proceed as required by law by misinterpreting and misapplying section 218. Specifically, AMR contends the PUC made three erroneous conclusions in its decisions: (1) "The multi-property microgrid tariff proposals of AMR . . . fail to comply with numerous statutory requirements of the California Public Utilities Code"; (2) "AMR's proposal should not be adopted because it does [not] comply with Section 218"; and (3) "AMR's proposed tariff focuses on a narrow set of priorities and does not fit within the contours of Section 218."

The PUC did not err by concluding AMR's proposed rule changes did not comply with section 218. AMR's proposed change to SCE Rule 2.H.1 states that "SCE *shall agree* to install facilities which are in addition to, or in substitution for the standard facilities SCE would normally install," and AMR's proposed change to Rule 16.F.2.b states that "SCE *shall agree* to

24

relocate or rearrange SCE's existing facilities." (Italics added.) Those proposed rule changes thus would strip SCE and the other IOU's of any discretion to deny a microgrid operator's request to relocate, rearrange, modify, or install additional facilities to their distribution systems in order to facilitate a microgrid.[11]

AMR's proposed changes to SCE Rule 18 would have permitted a customer operating a microgrid to receive electricity from SCE and use that electricity on separate premises if the customer is "compliant" with section 218(b). In other words, the proposed changes to SCE Rule 18 would permit an unregulated entity to privately distribute electricity received from a regulated electrical corporation.

AMR's proposed rule changes were hardly "modest," as AMR told the PUC or "narrow" as AMR asserts in its petition for review. To the contrary, as the PUC argues, AMR's proposed rule changes "would make global changes to the electric utilities' tariffs," and, as the IOU's argue, "would eliminate the regulated utilities' discretion by requiring them to modify their infrastructure upon customer demand."

In its decisions, the PUC repeatedly found that a regulated utility must operate and control its electric distribution grid and specifically found

[11] AMR argues its proposed rule changes would not have eliminated a regulated electrical corporation's discretion to deny such a request by a customer, but only would have eliminated the electrical corporation's *unfettered* discretion to deny the request. That is not what AMR's proposed rule changes said. AMR's proposed changes to SCE Rules 2.H.1 and 16.F.2.b are clearly written as commands. Neither proposed rule change is written in a way that would give SCE or another IOU any discretion to deny a request. Neither proposed rule change defines the scope and limits of an IOU's discretion. According to the IOU's, they do not now have unfettered discretion because a customer can bring its case to the PUC for individual determination.

that AMR's proposed rule changes "would allow an unregulated private party to control utility infrastructure." Those findings are consistent with the requirement imposed by the PUC that proposed tariffs in track 5 "[a]llow for the utility to always maintain control of its distribution system."

The PUC's findings are not erroneous. AMR's proposed changes to SCE Rules 2 and 16 would violate section 218 by creating the potential for an unregulated entity to exert some degree of control over a regulated utility's electrical distribution system. Under AMR's proposed rule changes, an unregulated microgrid operator would be able, on demand, to compel a regulated utility corporation to install additional facilities on the regulated utility's distribution system and relocate and/or rearrange existing facilities in order to facilitate a microgrid. The regulated utility would have no choice but to accede to the unregulated entity's demands. In those ways, AMR's proposed rule changes would allow an unregulated entity to exert control over a regulated utility's distribution system and thereby operate as an electrical corporation in violation of section 218.

AMR has not disputed SCE's claim that AMR's proposed rule changes could have resulted in a regulated utility being forced to sell, remove, or abandon in place its existing facilities, including underground cables, transformers, and related equipment. AMR argued to the PUC that "transferring redundant or unnecessary facilities as part of an interconnection should not operate as a barrier to AMR's planned microgrid" and there was or should be a process for "necessary facility transfers." As the IOU's pointed out in their comments to AMR's proposed rule changes, such forced transfer, which the regulated utility would have no discretion to avoid, could impair the utility's ability to serve other customers or require the construction of new facilities. In that regard, AMR's proposed rule changes

26

violated section 218 because, as the PUC found, an objective of section 218 is "to ensure the . . . reliability of the electricity supplied from the distribution grid to the customers, and to protect customers who may have no or limited choices about who provides their electricity."

AMR mentions its proposed rule changes to SCE Rule 18 a total of only two times in its writ petition, its reply to the answers filed by the PUC and the real parties in interest, and AMR's supplemental brief. In both instances AMR only describes the proposed changes and does not argue how the PUC abused its discretion by rejecting them. We therefore may consider AMR's challenge to the PUC decisions as to SCE Rule 18 to be forfeited. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 [""When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]""].)

We note nonetheless that AMR's proposed changes to SCE Rule 18 are contrary to section 218 because those changes would allow an unregulated entity to distribute energy received from an electrical corporation. In its track 2 decision, the PUC stated that "[SCE] Rules 18 and 19 prohibit one premise from supplying electricity to another premise to ensure safe and reliable distribution of power at reasonable rates" and relaxing some SCE Rule 18 requirements might have "unintended, negative consequences."

AMR lays much stress on its claims it is not an electrical corporation under section 218(a) and that it is exempt under section 218(b) from regulation by the PUC. AMR argues the PUC decisions, by treating it as an electrical corporation, are contrary to the text of section 218. The PUC did not make a finding as to whether AMR is an electrical corporation or would become one under its proposed rule changes. The PUC was never asked to

27

make such findings. The PUC's decision is premised on a recognition that AMR is *not* an electrical corporation and *not* subject to PUC regulation. AMR's rule changes would violate section 218 precisely because they would give microgrid operators which are *not* electrical corporations the ability to compel changes to, and thereby control, the distribution systems of regulated utilities.

In a similar vein, AMR argues the PUC's decisions are contrary to law because "[e]ach of AMR's proposals w[as] explicitly limited to microgrids that comply with [section] 218." (Italics omitted.) Section 218 simply provides definitions of what is and what is not an electrical corporation. Section 218 does not enable or entitle a nonelectrical corporation to compel a regulated utility to install additional facilities or modify its distribution system in order to facilitate a multi-property microgrid. The PUC decisions do not categorically bar AMR or any other nonelectrical corporation that is exempt under section 218(b) from PUC regulation from installing a multi-property microgrid.

AMR argues the PUC erred by finding that AMR's proposed rule changes "focus[ ] on a narrow set of priorities and does not fit within the contours of Section 218." The PUC did not err. AMR's proposed rule changes did indeed focus on a narrow priority: Resolving AMR's dispute with SCE by compelling it to agree to AMR's connection and/or interconnection requests. In the petition for writ of review, AMR narrowly described this case as "pertain[ing] to the [PUC]'s refusal to require SCE to serve a business customer [(AMR)] that, in full compliance with Section 218, seeks to operate a microgrid between two customer[-]owned properties separated by a public street." Track 5 of the rulemaking was not intended to adjudicate AMR's dispute with SCE. The PUC's responsibilities were not narrowly limited to

meeting one stakeholder's wants or resolving a stakeholder's dispute: Instead, the PUC was undertaking a quasi-legislative action to establish rules affecting an entire industry. (§ 1701.1, subds. (a), (d)(1).)

AMR contends the PUC misinterpreted section 218 by finding that an entity selling electricity to more than two contiguous parcels or across a street must become a regulated electrical company. AMR argues that "[b]ecause AMR's proposal was expressly limited to microgrids that do not sell electricity or otherwise violate Section 218, nothing in Section 218 justified rejecting the proposal." The PUC's interpretation of section 218 is not so much erroneous as it is incomplete: An entity producing power from a nonconventional power source and using or selling that power to adjacent real property across an intervening public street *is* an electrical corporation *unless* at least one of the conditions of section 218(b)(2)(A) through (C) is satisfied.

But even assuming the PUC did misinterpret section 218 in that respect, AMR has failed to show the error was prejudicial. (*Community Choice, supra*, 103 Cal.App.5th at p. 860 [PUC decisions may be set aside if its failure to proceed in the manner required by law resulted in prejudice].) The PUC's conclusion that AMR's proposal violated section 218 was not based on whether AMR or another microgrid operator sells electricity, but upon the potential for the proposed rule changes to allow an unregulated microgrid operator to control a regulated utility's distribution infrastructure. In addition, as we shall discuss, the PUC's decisions were based on other factors, including sections 399.2 and 451 and the need to ensure system, worker, and public safety. In light of those factors, it is not reasonably probable the PUC would have reached a result more favorable to AMR in the

29

absence of the presumed error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

AMR's proposed rule changes would, as the IOU's argue, "enable unregulated microgrid developers to dictate the installation or modification of utility distribution facilities for microgrids with interconnections to the broader grid, and to distribute electricity generated by the regulated utility, so long as the developer is not an electrical corporation subject to [PUC] regulation under Section 218." The PUC did not err by finding that AMR's proposed rule changes violated and would "circumvent[ ]" section 218.

**IV.**

**The PUC's Decisions Were Based on Statutes and Factors in Addition to Section 218**

The PUC's decisions are not based solely on section 218. The PUC also concluded, correctly so, that AMR's proposed rule changes were in contradiction to sections 399.2 and 451. In Decision No. D.24-11-004, the PUC concluded that the stakeholders' multi-property microgrid tariff proposals (which would include AMR's proposed rule changes) "call for unregulated parties to control and/or operate microgrids in direct contradiction of Sections . . . 399.2 [and] 451."

The PUC's decisions were necessary to satisfy the dictates of section 399.2. It recites the state policy that "each electrical corporation shall continue to operate its electric distribution grid in its service territory" (§ 399.2, subd. (a)(1)) and, in furtherance of that policy, "each electrical corporation shall continue to be responsible for operating its own electric distribution grid" (*id.*, subd. (a)(2)). Such operation includes "controlling, operating, managing, maintaining, planning, engineering, designing, and constructing its own electric distribution grid." (*Ibid.*) AMR's proposed

30

changes to SCE Rules 2 and 16 were directly contrary to section 399.2 because, as we have explained, they would enable unregulated entities to control, operate, or manage a regulated utility's electrical distribution system.

Section 451 provides, in relevant part, that "[e]very public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, . . . and facilities, . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public." Section 8371 directs the PUC to develop large electrical corporation rates and tariffs to support microgrids, "while ensuring that system, public, and worker safety are given the highest priority." (§ 8371, subd. (d).)

In its reply brief, AMR argues that "safety concerns were not the basis of the PUC's decision" and "[t]he only conclusion of law that addressed AMR's proposal stated . . . 'AMR's proposal should not be adopted because it does not comply with Section 218.'" In decision No. D.24-11-004, the PUC expressly found: "Worker safety and grid reliability are absent from the *stakeholder* proposals." (Italics added.) AMR is a stakeholder and made proposals. The PUC therefore found that worker safety and grid reliability were absent from AMR's proposed rule changes.

The PUC made other findings, applicable to all stakeholder proposals, that relate to safety. Those findings included, (1) "[t]o ensure system, public, and worker safety are given the highest priority, a regulated utility must control and operate a multi-property microgrid if the multi-property microgrid uses the regulated utility's distribution system," (2) "[r]egulated control of the distribution system is essential to public and worker safety and grid reliability," and (3) "[t]o ensure system, public, and worker safety are given the highest priority, regulated entities must operate

31

and control their electric distribution grid." As an example of a safety concern, the PUC found: "[A]fter any outage, crews must perform restoration work to ensure that it is safe to reenergize the utility's grid. An unregulated third party cannot decide when a microgrid can begin actively discharging to the regulated utility's grid while utility employees may be working on the grid."

AMR contends those safety concerns are without merit and claims the example offered by the PUC was incorrect for two reasons.[12] First, AMR argues its proposed rule changes would only apply to microgrids that do not sell electricity, and "many such microgrids would not export electricity to the grid and or have the facilities to do so." AMR's proposed rule changes are not limited, however, to microgrids that do not export electricity.

Second, AMR argues that if a microgrid exports electricity to the grid, that microgrid would be subject to an IOU's interconnection rules, and those rules "would allow the IOU to require installation of interruption and other protective devices that allow the IOU to control when and how electricity is exported to the grid." To support that argument, AMR cites only to SCE Rule 21, which is 235 pages in length. AMR does not pinpoint any

[12] AMR asserts its proposed rule changes would not result in unregulated microgrids because "they would be subject to regulation by local and municipal authorities." AMR does not identify those authorities or their regulations to which it would be subject. And, of course, local and municipal regulations vary throughout the state. Only the PUC has constitutional and legislative authority to regulate public utilities throughout the State of California (Cal. Const., art. XII, §§ 2, 4, 6; § 701), and that authority extends to safeguarding the health and safety of employees, customers, and the public (§ 768). Local governments are preempted from regulating matters within the PUC's jurisdiction. (Cal. Const., art. XII, § 8.)

relevant provisions in SCE Rule 21.[13] "It is not our place to comb the record seeking support for assertions parties fail to substantiate." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 534.) To the extent AMR is making a sufficiency of the evidence argument, it necessarily fails because in a challenge to a rulemaking decision, the PUC's factual findings are not subject to substantial evidence review. (§ 1757.1, subd. (a); *Community Choice, supra*, 103 Cal.App.5th at p. 854.)

In addition, AMR has forfeited any argument based on SCE Rule 21. A party seeking judicial review of a PUC decision must first bring an application for rehearing specifically setting forth "the ground or grounds on which the applicant considers the decision or order to be unlawful." (§ 1732; see § 1756, subd. (a).) "No corporation or person shall in any court urge or rely on any ground not so set forth in the application." (§ 1732.) "In other words, the petitioner may not raise in court a matter not included in its application for rehearing." (*Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 696 (*Utility Consumers' Action Network*).)

In the rulemaking proceedings, both SCE and CUE raised safety concerns in their comments regarding AMR's proposed rule changes. In responding to SCE's and CUE's comments, AMR did not mention SCE Rule 21 but argued that local authorities would ensure that microgrids met applicable safety standards. AMR did not mention SCE Rule 21 in its application for rehearing, even though the PUC had found that worker safety

---

[13] In response, CUE argues that "[w]hile interconnection protective devices may prevent certain types of discharge or provide technical safeguards under normal operating conditions, they cannot substitute for the utility's operational authority to control reenergization decisions in real time during emergency restoration."

was absent from the stakeholder proposals and made other findings related to safety.[14]

## V.

## The PUC's Decisions Are Consistent with Section 8371

AMR argues the PUC misinterpreted section 8371 in two ways. First, AMR contends that in denying AMR's application for rehearing, the PUC erroneously found that "'[t]he [PUC] has already satisfied the requirements of section 8371'" before considering AMR's proposed rule changes. Second, AMR contends that denial of AMR's proposed rule changes "is contrary to the clear language and intent behind [section] 8371." Neither argument has merit.

A. *The PUC Did Not Err by Finding It Had Satisfied Section 8371's Requirements*

Section 8371 states, in relevant part: "The [PUC], in consultation with the Energy Commission and the Independent System Operator, shall take all of the following actions by December 1, 2020, to facilitate the commercialization of microgrids for distribution customers of large electrical corporations." Section 8371 then lists six actions the PUC had to complete by that date. (§ 8371, subds. (a)–(f).) On June 17, 2020, the PUC issued decision No. D.20-06-017 which addressed the actions identified in subdivisions (a),

---

[14] SCE explains in its supplemental brief that SCE Rules 2.H, 16.F, and 18 address matters different from those addressed by SCE Rule 21. While SCE Rule 21 focuses on the "technical mechanics" of the interconnection process, SCE Rule 2.H addresses "the processes for 'Added Facilities' that a customer seeks to supplement to regulated grid infrastructure," SCE Rule 16.F addresses "service relocation or rearrangement, including modification of existing infrastructure," and SCE Rule 18 "covers the supply of electricity by customers to separate premises and use by others more broadly."

(b), and (d) through (f) of section 8371 and instituted a rulemaking proceeding. On January 21, 2021, the PUC issued decision No. D.21-01-018 which addressed the actions identified in subdivision (c) of section 8371 and further addressed the actions identified in subdivisions (e) and (f). The PUC therefore did not err by finding it had satisfied the requirements of section 8371 before considering AMR's proposed rule changes.

If the PUC did so err, the error was harmless. In track 5, the PUC considered AMR's proposed rule changes, as well as the proposed tariffs of other stakeholders and the IOU's, before issuing decision Nos. D.24-11-004 and D.25-06-067.

B. *The PUC's Decision Is Consistent with Section 8371*

1. Statutory Language

AMR argues the PUC's denial of its proposed rule changes is contrary to section 8371's directive to the PUC to "facilitate the commercialization of microgrids for distribution customers of large electrical corporations" and to "develop separate large electrical corporation rates and tariffs, as necessary, to support microgrids." We disagree.

Section 8371 directs the PUC to "facilitate the commercialization of microgrids for distribution customers of large electrical corporations" by taking the specific actions identified in subdivisions (a) through (f) by December 1, 2020. Other than taking those actions, section 8371 does not expressly impose any obligations on the PUC to facilitate commercialization of microgrids. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 689 ["To construe a statute as imposing a mandatory duty on a public entity, 'the mandatory nature of the duty must be phrased in explicit and forceful language'"].)

Assuming section 8371 by implication imposes a general obligation on the PUC to facilitate commercialization of microgrids beyond the statutorily required actions, the PUC met any such obligation by developing a microgrid multi-property tariff and issuing decision Nos. D.24-11-004 and D.25.06-067. The PUC's decisions to deny AMR's proposed rule changes were not inconsistent with or contrary to the statute. Section 8371's directives are broadly drafted and do not specify any details or requirements on how distribution systems and facilities for multi-property microgrids must work. As the PUC argues, in section 8371 "the Legislature provided general policy objectives and outcomes, leaving significant room for the [PUC] to determine the most appropriate means of meeting them."

The one specific directive that section 8371 does give is that "ensuring that system, public, and worker safety are given the highest priority." (§ 8371, subd. (d).) Public safety is also mandated by section 451, and system reliability is mandated by section 761, which grants the PUC authority to issue orders to regulate public utility services that "are unjust, unreasonable, unsafe, improper, inadequate, or insufficient." Interpreting section 8371 as requiring the PUC to adopt AMR's rule changes would conflict with section 399.2 which, as we have explained, mandates that electrical corporations continue to operate their electric distribution grids within their respective service territories and to do so "in a safe, reliable, efficient, and cost-effective manner." (§ 399.2, subd. (a)(1) & (2).)

The definition of microgrid found in section 8370, subdivision (d) does not help AMR. Section 8370, subdivision (d) says only that a microgrid "can connect to, disconnect from, or run in parallel with, larger portions of the electrical grid." It is true, as AMR contends, that the definition of microgrid on its face does not preclude an interconnected system from using privately

36

owned connections between loads and energy sources on opposite sides of a street. But neither does that definition mean the PUC must adopt tariffs that would entitle a microgrid operator to demand that a regulated utility relocate or rearrange existing facilities or install additional facilities to accommodate a connection or an interconnection.

In sum, section 8371 cannot be reasonably interpreted to mean the PUC must adopt any and all proposals which might in some way facilitate commercialization of microgrids for distribution customers, without regard to other statutory mandates, system reliability, the effect on other customers, and system, worker, and public safety. Given section 8371's broadly drafted directives, the highest priority given to safety (§ 8371, subd. (d)), the requirement that electrical corporations operate their distribution grids (§ 399.2), the PUC's broad authority to regulate utilities (*San Diego Gas & Electric Co. v. Superior Court, supra*, 13 Cal.4th at pp. 914–915), and its quasi-legislative role in rulemaking (*Center for Biological Diversity, supra*, 18 Cal.5th at p. 305), the PUC acted in conformance with section 8371 by declining to adopt AMR's proposed rule changes.

2. Legislative History

In its reply brief, AMR quotes parts of section 8371's legislative history to argue that "[i]n enacting [Senate Bill No.] 1339, the Legislature contemplated that microgrids could be owned and operated by individual customers and treated as a single entity by the grid operator." In particular, AMR quotes legislative findings that "[m]any electricity customers are seeing the potential benefits of investing in their own distributed energy resources as part of microgrids" and "[a]llowing the electricity customer to manage itself according to its needs, and then to act as an aggregated single entity to the distribution system operator, allows for a number of innovations and

37

custom operations." (Historical and Statutory Notes, 57C West's Ann. Pub. Util. Code (2026 supp.) foll. § 8370, p. 31.)

AMR also quotes the following passage from a Senate Rules Committee Analysis: "In addition to the increased reliability, microgrids with properly configured controllers have the potential to provide lower electricity bills for the customer and cleaner air by displacing the need for energy generating resources with higher emissions. Specifically, microgrids can control the rate and schedule of distributed energy generation resources, coordinate the use of energy storage, and implement demand response." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1339 (2017–2018 Reg. Sess.) as amended Aug. 28, 2018, p. 4.)

Those legislative findings and the Senate Rules Committee analysis extol the potential benefits of microgrids but, like section 8371 itself, say nothing about how distribution systems for microgrids must work. We do not read this legislative history as supporting an interpretation of section 8371 that would have required the PUC to approve AMR's proposed rule changes. Moreover, "while uncodified legislative findings may be used as an aid in construing a statute, they "" "do not confer power, determine rights, or enlarge the scope of a measure." " " (*People v. Chhuon & Pan* (2026) 19 Cal.5th 1018, 1104, fn. 12.)

AMR also quotes two passages from the June 27, 2018 Analysis of the Assembly Committee on Utilities and Energy. First, that analysis states that Senate Bill No. 1339 "[p]ermits a microgrid to be owned by an IOU, POU, community choice aggregator (CCA), third party, or customer." (Assem. Com. on Utilities and Energy, Analysis of Sen. Bill No. 1339 (2017–2018 Reg. Sess.) as amended June 11, 2018, p. 1.) Second, the analysis states: "[O]peration of the microgrid is normally determined by the needs of the

38

primary customer or end-user. There is clearly an added cost to design, install and operate a microgrid. The end-user who makes this decision normally has a history of energy issues or specific energy needs that justifies the cost and effort to install and operate a microgrid." (*Id.*, at p. 5.)

The first quote merely confirms that a third party or customer may own a microgrid. The second quote makes the unremarkable observations that microgrid operation is determined by the primary customer's needs and that there are costs to designing, installing, and operating a microgrid. Neither passage quoted by AMR supports an interpretation of section 8371 that would have required the PUC to adopt AMR's proposed rule changes.

The same Assembly analysis states that Senate Bill No. 1339 "calls for an interconnection process and tariff for microgrids" and makes recommendations "to develop processes for interconnection of customer-supported microgrids." (Assem. Com. on Utilities and Energy, Analysis of Sen. Bill No. 1339 (2017–2018 Reg. Sess.) as amended June 11, 2018, p. 5, italics omitted.) While one recommended process is to "[d]evelop methods to reduce cost barriers for, without shifting costs to ratepayers, for microgrid interconnection requirements" (*id.*, at p. 6), the analysis does not mandate any particular method or process, or require the PUC to adopt connection and interconnection methods in line with AMR's proposed rule changes.

3. "Neighborhood-type" Microgrids

In its reply brief, AMR argues that the PUC "was obligated to [give] effect [to] the intent of the Legislature in enacting S[enate] Bill No.] 1339" and "was therefore required to adopt AMR's proposed tariff or another tariff that would permit IOU customers to develop and interconnect neighborhood-type microgrids." The issue before us is whether, under the

39

relevant standard of review, the PUC erred by declining to adopt AMR's proposed rule changes. The issue whether the PUC should have adopted some other proposed tariff, which AMR has not identified, is not before us.

According to AMR, the PUC's decisions "categorically bar all neighborhood-type microgrids." In its application for rehearing, AMR did not set forth as a ground on which it considered the PUC's decision to be unlawful any obligation on the part of the PUC to adopt a proposal that would permit private companies to develop and interconnect "neighborhood-type" microgrids. The term "neighborhood-type microgrids," which is not defined by statute, did not appear in any of AMR's filings with the PUC—or this court—until AMR's reply brief. AMR's argument regarding neighbor-type microgrids is therefore forfeited. (§ 1732; see *Utility Consumers' Action Network, supra,* 187 Cal.App.4th at p. 696.)

In its track 5 decision the PUC approved, with modifications, tariffs proposed by the IOU's to facilitate commercialization of multi-property microgrids. AMR points to nothing in the approved tariffs that would categorically bar a "neighborhood-type" microgrid, and the PUC's decisions to reject AMR's proposed rule changes do not bar microgrids developed by nonelectrical corporations.

## DISPOSITION

The PUC decisions are affirmed. Respondent and real parties in interest may recover costs incurred in this proceeding.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P. J.


MOORE, J.